S. R. FOWLE & SON v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 22 April, 1908).

1. Negligence—Defective Flues—"Stovepipe"—City Ordinance—Interpretation.

A city ordinance providing that, "whenever any *stovepipe* used in any building in its corporate limits shall pass through a wall, partition, flooring or ceiling," it shall be enclosed in brick where it so passes and separated from contact by brickwork not less than four inches in thickness and not permitted to be nearer the woodwork than two inches, etc., refers to a metal pipe and has no application to earthen or terra·cotta flues into which the pipe is inserted.

2. Same—Notice.

Where the evidence established the fact that the defendant used a terra cotta or earthen flue instead of a brick flue in carrying the smoke from a stovepipe used in its building, and a city ordinance prohibited the use of a stovepipe for the purpose unless protected by brickwork from the woodwork of the building, it was error in the Judge to instruct the jury, in an action for damages alleged to have been thereby caused, to find for the plaintiff upon the question of negligence, if he had shown by the greater weight of evidence that the fire originated from a pipe or flue constructed contrary to the provisions of the ordinance, there being no evidence that the fire originated from any defect in the stovepipe.

3. Same—Competent Builder, Reliance Upon—Maintenance.

In an action for damages alleged to have been occasioned by fire from the faulty construction of a flue through the roof of the

building, when the evidence was conflicting, it was error in the Judge to refuse to instruct the jury that "If you find the flue in question was constructed by a competent builder, of safe material, in a safe manner, and was not negligently permitted to become defective, the maintenance of the flue was not negligence, even if the fire originated therefrom."

ACTION tried before *O. H. Allen, J.,* and a jury, at October Term, 1907, of BEAUFORT.

The plaintiffs allege that the defendant erected and maintained in the town of Washington, N. C., a freight depot, warehouse and office, one end of which extended over the water of Pamlico River 24 feet, supported by piles, and the other end fronting on Main Street. Said building was 145 feet long, 77 feet wide and 11 feet between floor and joists. The cars ran alongside the building for the purpose of receiving and unloading freight. Near the end extending over the water was a "slip," into which boats entered to receive and unload freight. At this point there were large doors. Plaintiffs allege that the arrangement made in said building for protection against fire originating from a stove used in the office was negligent and dangerous; that the flue was negligently constructed and maintained in violation of the ordinance of the town; that the warehouse was in such close proximity to the buildings of plaintiffs and other persons that defendant was compelled to take notice of the danger to them by fire if its property was burned; that by reason of the negligent construction and dangerous condition of the flue the warehouse caught fire and was burned on 8 February, 1902, and the fire communicated to and destroyed plaintiffs' property, to their damage more than $5,000.

The defendant denied all allegations of negligence in the premises, and the case was submitted to the jury upon the issue thus raised by the pleadings.

The testimony tended to show that in the warehouse, on one side thereof, an office was "cut off," by boarding up, for the use of defendant's agents and clerks. Hanby, a witness for

defendant, thus describes the manner in which it was constructed and the flue placed. Witness was in charge of the building during the year 1892 or 1893. He says: "The office ceiling was seven-eighths tongue-and-grooved material and the joists were 2 by 8. On top of the joists we had 2-inch boards, with a hole sufficiently large for the pipe to go in and leave a little space of three-eighths or half an inch all round as clear space. We cut a hole through the ceiling and left three-eighths of an inch clear space all round. We set the pipe in mortar on the boards and kept on in the usual way of putting pieces up and putting some mortar round them. We placed a collar round the flue where it passed through the roof. I think the flue extended three or three and one-half feet above the roof. This flue was made of fire clay, the same as furnace brick. The inside diameter of the flue was six inches and it was one inch thick. The flue was perfectly stable, steady and secure. The flue extended below the ceiling one and one-half inches or one and one-fourth inches. Around the lower part of the base of the flue we used the heaviest tin we had and riveted it together and made a collar to fit around the flue tight, not specially as a protection against fire, but to keep people from shoving it out, and the collar was also intended to prevent cracking when expansion took place." After the witness had testified to his experience the court held he had qualified himself as an expert.

Q. "Take a fire-clay flue constructed as you have described the construction of this flue. I ask you whether it was a safe flue." A. "Perfectly safe."

Mr. Johnson testified to the same in regard to the construction of the office and the flue. He says that a hood was placed over the flue.

Mr. Harding, a witness for plaintiffs, says that he is a carpenter. "Prior to the fire I had occasion to examine the flue leading from the office through the ceiling and roof. The

agent asked me to stop a leak. I went on top of the roof and found that one of the jars or pieces about two feet long was split. The crack was about the size of a pencil. Water would go through the crack and down on the stove. I do not know how far the crack extended below the roof, but it extended the length of the section. I told the agent that he would have to have a tinner, that the jar was broken and he needed a new one." This witness gave it as his opinion that terra cotta flues, such as this, were not safe. He did not remember how long this examination was before the fire. He recommended that Mr. Phillips be employed to fix the flue.

Mr. Phillips was introduced by defendant and testified as to the condition of the flue and the work which he did upon it. After describing its construction and condition, he says: "I bought a new flue from Mallison's, which was similar to the old flue which I took out. In fact, it was just like it, as near as I can tell. I bought three new sections. I constructed the lower section just as it had been put in before." He described the flue and the work which he did upon it at much length. Some of the witnesses speak of the flue as terra cotta and others as fire clay.

C. F. Bland, a witness for defendant, says that he was assistant agent at Washington at the time of the fire. The office had been enlarged and the stove set about midway. When Phillips repaired the flue a new stove was put in. It seems that the pipe rested on the stove, went up and into the flue, extending some few inches above the ceiling. Witness discovered the fire about 4:40 o'clock in the afternoon. The Old Dominion steamer left the slip about 4 o'clock. The steamer *Myers* came in after she left. "The fire was called to my attention by a colored man named James Knight. The fire had died down in the stove and the office was getting cool, and I had sent the man out to get a scuttle of coal. He came in with the coal and called my attention to the fire, and I looked through a crack in the ceiling and saw a blaze of fire

above the ceiling. The blaze was about two and a half feet from the flue and next to the river, being about southwest from the flue. As near as I could see, the blaze was in the roof. At that point I should say the roof was about fourteen or eighteen inches above the ceiling. It was a very small blaze when I discovered it. We used hard coal in the stove. This coal makes practically no blaze. I do not think I have ever seen sparks coming from it." He testified that there was before the fire a charred place in the ceiling, caused by the stovepipe settling down and coming out of the flue. This was about two months before the fire. It was fixed securely and was in secure condition at time of fire.

J. G. Chauncey, a witness for plaintiffs, testified that the warehouse had openings at each end and in the west side next to the slip which separated it from the Old Dominion warehouse. The end was next to Main Street and it extended back beside the slip to the river. There were railroad tracks in the warehouse. "When I reached the warehouse the fire did not seem to have been burning long, and I saw a blaze a foot or eighteen inches above the office ceiling. The flue from the stove went up straight. The blaze I saw was close by the flue. · * * * It was a terra cotta pipe which ran through the ceiling. This terra cotta flue was six or six and one-eighth inches. The flue went from the office up through the ceiling and through the roof. There appeared to be three or four feet of the flue between the roof and the office ceiling. From what I saw, the fire looked like it was right around the pipe, but I cannot say positively." This witness also testified in regard to an explosion caused by some powder in the warehouse. He says that they used all possible means to prevent the fire spreading to plaintiffs' property. There were other buildings between the warehouse and plaintiffs' property which were burned. Upon cross-examination he says: "When I got to the building I did not see any fire in the roof; all I saw was near the top of the office. * * * This flue

seemed to be of fire brick, but harder.  I gave notice to this
company of the town ordinance prohibiting the use of the
stovepipe, and carried the notice direct to them and directed
them to move the pipe."  He was chief of the fire depart-
ment.

Mr. Bragaw, for plaintiffs, testified that he was a fire insur-
ance agent.  Flue was in the southwest corner of office.  The
flue went through the ceiling of the office and the roof of the
warehouse.  "I should judge there was a space between ceil-
ing and roof of two feet."  He says that when he saw the
fire it was "just beyond top of office."  He gave it as his
opinion that terra cotta flues are not safe—are liable to crack
under the effect of heat and cold.

Mr. S. R. Fowle, one of the plaintiffs, testified in regard
to the value of property; amount of loss, etc.  He says that
he has had experience in building, using terra cotta flues.
They are not safe—subject to crack from heat and cold.

Dr. Tayloe, witness for plaintiffs, says that he first saw the
fire and gave the alarm.  "At that time smoke was emerging
from under roof, before the blaze broke through.  I saw the
smoke emerging from near the flue."

Defendant's agents denied that any notice was given them
by Mr. Chauncey of the ordinance.  There was much other
evidence, and several witnesses expressed differing opinions
in regard to the safety of flues.  There was testimony *pro*
and *con* regarding the probability of fire in steamers in the
slip.  This is not material, in the view taken by the Court.
The plaintiffs introduced the following ordinance :

*"Be it ordained,* That whenever any stovepipe used in any
building in the corporate limits of the town shall pass through
any wall, partition, flooring or ceiling, said stovepipe shall
be enclosed within brick where it passes through such wall,
partition, flooring or ceiling, and shall be separated from con-
tact with such wall, partition, flooring or ceiling by brickwork
not less than four inches in thickness, and such stovepipe

shall not be permitted to be nearer to any wood in such build-
ing than two inches at any point.    Any violation of this ordi-
nance shall subject the offender to a fine of ten dollars, and
the stovepipe used in such building in violation of this ordi-
nance shall be torn down by the policemen of the town."

Defendant objected and excepted.    There was a verdict for
plaintiffs.    Judgment.    Appeal.

The exceptions are discussed in the opinion.

*Bragaw & Harding* and *Ward & Grimes* for plaintiffs.
*Small, McLean & McLean* for defendant.

CONNOR, J.    The defendant requested his Honor to in-
struct the jury that the city ordinance introduced by the
plaintiffs did not apply to the conditions disclosed by the evi-
dence; that the evidence did not disclose the case of a stove-
pipe passing through any wall or ceiling within the language
or meaning of the ordinance.    As we understand the testi-
mony, the stovepipe rested upon or was attached to the stove
in defendant's office and extended up to and entered the flue
of terra cotta or fire clay.    The flue rested upon and, in some
way not very clearly described, extended one and a fourth or
half inch below the ceiling.    At the entrance the pipe was
held steadily in position by a tin collar.,  All of the testimony
shows that the hole cut in the ceiling was larger than the flue
and the space filled in with mortar.    The flue into which the
pipe entered passed through the roof, extending above it three
and a half feet, and was "capped" or covered with a "hood."
The ordinance was evidently intended to prohibit a custom,
which experience has taught to be dangerous, of passing stove-
pipes through walls and ceilings of wood.    The word "stove-
pipe" is well understood to refer to a pipe made of either
sheet iron or heavy tin, which usually connects the stove with
the chimney or flue, made either of brick or fire clay or terra
cotta.    The evident purpose of the ordinance was to require
that when a stovepipe passed through the ceiling it should

147—32

be separated from the wood in the manner directed. The testimony of the witnesses who constructed the flue and adjusted the pipe excludes the idea that the latter passed through the ceiling, within the terms or meaning of the ordinance. The distinction between a stovepipe and a flue is clearly recognized by the act of 1905, ch. 506, secs. 17 and 20. His Honor was evidently of the opinion that the word "pipe" included both the flue and the metal pipe. He said to the jury: "If the plaintiff has shown by the greater weight of the evidence that the fire originated from the pipe or flue, and that the flue was constructed in a manner that was in violation of the town ordinance, your answer should be 'Yes.'" He further said in this connection that by "pipe" he meant "either earthen or metallic." In this view of the ordinance the jury were compelled to find that the defendant had violated its terms. If the "earthen" flue must enter brickwork not less than four inches in thickness, etc., it was manifest that the terms of the ordinance were not complied with. We cannot concur with his Honor's construction of the ordinance. We find but one witness who speaks of the stovepipe extending into the flue above the ceiling. Mr. Bland says that the pipe settled and the joints overlapped; that the result was that the lower side of the ceiling became charred, and he pushed the pipe up so that it extended beyond the ceiling about six inches, this, of course, being separated from the wood by the walls of the flue and the collar. There is no suggestion by any witness that the flue was not carefully and properly constructed and secured or that the pipe was not properly secured therein. But if the pipe was not separated from the wood in the manner required by the ordinance the defendant insisted that there was no evidence that the fire originated at the place where the stovepipe entered the flue, and that therefore such condition was not the proximate cause of the fire. His Honor told the jury that before they could fix liability upon defendant on account of the violation of the

ordinance they must find that it was the proximate cause thereof. The first witness who saw the fire from the outside was Dr. Tayloe, who says: "The smoke was emerging from under the roof before the blaze broke through from near the flue." Mr. Chauncey says: "I saw a blaze a foot or eighteen inches above the office ceiling, close by the flue." Mr. Bland says that the fire had died down in the stove and the office was getting cool; that he had sent a man out to get a scuttle of coal; that he came in with the coal, and before putting it on the fire he called witness' attention to the fire; that he looked through a crack in the ceiling and saw a blaze above the ceiling, about two feet from the flue; that, as near as he could see, the blaze was in the roof, which was about fourteen or eighteen inches above the ceiling; that they used hard coal in the stove. The colored man, Knight, who brought in the coal, corroborated Mr. Bland. In this respect we find no contradictory testimony. Mr. Bragaw says "the fire seemed to be making from the space over the office towards the slant of the roof." We fail to find any evidence locating the fire at the point where the stovepipe entered the flue. From the uncontradicted testimony of Mr. Bland, corroborated by the colored man, Knight, and the natural evidence, it is difficult to see how the fire could have originated by heat communicated by the stovepipe at the point of entrance into the flue. The construction of the flue, resting upon the ceiling, would have protected the upper side of the ceiling, and if the heat from the stovepipe had been sufficient to ignite the wood it would have first appeared on the lower, unprotected side. Again, all of the plaintiffs' evidence—every witness who expressed the opinion that terra cotta or fire clay flues are unsafe—gave as a reason: "They will crack from heat or cold and from water when they are hot." This is the language of Mr. Fowle, Mr. Bragaw and Mr. Chauncey. Not one suggests that the heat from the stove would communicate fire through them. His Honor charged the jury: "If you shall find from

the evidence that the ordinance introduced in evidence by the plaintiffs had been in force since 3 December, 1900, in the town of Washington at the time of the fire, and was passed for the purpose and intention to prevent the catching of buildings on fire in the corporate limits of the town and the spreading of such fire to adjacent buildings, and that the defendant used and operated its flue in violation of such ordinance, this would constitute negligence on the part of the defendant; and if this negligence was the proximate cause of the plaintiffs' injury—that is to say, if the fire caught from defendant's building by reason of the manner in which they were using their flue in violation of the ordinance, and the fire by natural cause and effect and under such conditions of wind and other surroundings as a reasonable man could have anticipated and under the conditions that existed at the time of the fire, in fact, caught—then the defendant would be liable for such damages as resulted to the plaintiffs therefrom." Defendant excepted.

The ordinance did not prescribe the manner in which defendant should use and operate its flue, but the manner in which the stovepipe should pass through the ceiling. We think, however that may be, there was error in leaving to the jury the question of proximate cause in that connection. As we have said, we find no evidence that the fire originated at the point of connection between the stovepipe and the flue. Thus eliminating the ordinance from the case, the question arises whether there was any evidence of negligence in the use of the flue—that is, whether the flue made of terra cotta or fire clay was reasonably safe, or, as his Honor correctly said to the jury, whether a man of ordinary prudence, having due regard to the safety of his own and the property of others, would use the flue (described by the witnesses) in the manner and at the place which they were used by defendant. Defendant insists that there is no evidence tending to show negligence in this respect, and that his Honor should have granted

the motion for judgment of nonsuit.    It is conceded that these flues were prior to the passing of the ordinance in general use in Washington.    Mr. Chauncey says that he has taken out of houses since that time three hundred of these flues.    He says the objection to them is that "when heat was on them they would burst."    Mr. Bragaw, who is in the insurance business, says that his opinion, backed by observation, is that fireclay flues are not a proper precautionary measure against fires on any premises—they are liable to crack.    Mr. Fowle says that he has built many houses for himself and others, that he has observed them for ten years and that he has been taking these flues out "lately."    Mr. Harding, a carpenter, examined the flues some years ago and found one of them cracked, and advised the defendant's agent that he "needed a new one."    Mr. Phillips says that he took out the old or cracked flues and put in new ones.    This was about a year or eighteen months before the fire.    A number of defendant's witnesses—mechanics and builders—express the opinion that the terra cotta flue is safe for the use to which it was put.    This contradictory testimony was properly submitted to the jury.    There is also evidence tending to show that defendant's agent was notified to take the flues out.    This is denied.    The evidence is competent upon the question of notice to defendant that the flue was not safe, if the jury so find.    The first question to be settled by the jury is whether the fire originated from cracks in the flue.    There is no direct evidence that there were any such cracks.    The only evidence in that respect is that some eighteen months before the fire one section of the flue was found to be cracked and taken out; that a new flue of the same kind was put in.    The learned counsel for plaintiffs strongly urged before us the view that by reason of the length of the building, its extension resting on piles twenty-four feet over the water, the striking of steamboats upon its side in the slip, the running of cars and heavy trucks, the building was caused to vibrate and loosen the sections of the flue or to

break it.  The defendant, on the other hand, argues that the
fire was caused by sparks from the steamboats, etc.  It is ex-
tremely difficult to fix with any degree of certainty how many
fires originate.  Different theories are advanced in almost
every instance.  The defendant requested his Honor to in-
struct the jury: "If you find that the flue in question was
constructed by a competent builder and of safe material and
in safe manner, and that the defendant did not negligently
permit the same to become defective, then the court instructs
you that the maintenance of the flue so constructed was not
negligence, and this would be true even if you should further
find that the fire originated from the flue.  If you should so
find, you should answer the first issue 'No.' "

The court declined to charge the jury as requested, and the
defendant excepted.

We think defendant was entitled to this instruction.  It
correctly states the measure of duty which the law imposes
upon the owners of buildings.  Persons constructing and
using buildings are compelled to rely upon the judgment of
competent builders, of those who by reason of skill and expe-
rience are fit and competent to be consulted and entrusted
with the erection of buildings, with arrangement for fires
therein, and it may be relied upon with that degree of safety
which the law requires.  If the jury found the conditions in-
volved in the instruction, we think that no negligence can be
attributed to defendant.  In *Parker v. Moore,* 91 N. C., 275,
the stovepipe was run through the wall and "the fire origi-
nated where it passed through the wall."  It was not pro-
tected in any way.  The distinction between the cases is
manifest.  The only evidence of negligence which we find in
the record is the opinion of witnesses that the terra cotta or
fire clay flue is liable to crack from heat and cold.  A num-
ber of witnesses express the opinion that they are safe means
of carrying off the smoke from stovepipes.  As we have said,
there is no direct evidence that the defendant's flue was

cracked, and if so, that defendant's agent had any notice thereof. There may be circumstances and conditions from which a jury could infer such defect and knowledge. For the errors pointed out there must be a

New Trial.